IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| John Johnson, Individually and On Behalf of All Others Similarly Situated, | Case No. 3:05cv7388 |
| Plaintiff, | |
| v. | ORDER |
| Dana Corporation, *et al.*, | |
| Defendants. | |

| | |
|---|---|
| Howard Frank, Individually and On Behalf of All Others Similarly Situated, | Case No. 3:05cv7393 |
| Plaintiffs, | |
| v. | |
| Dana Corporation, *et al.*, | |
| Defendants. | |

| | |
|---|---|
| Amalgamated Workers Union, et al., Individually and On Behalf of All Others Similarly Situated, | Case No. 3:05cv7406 |
| Plaintiffs, | |
| v. | |
| Dana Corporation, *et al.*, | |
| Defendants. | |

| | |
|---|---|
| Donald Doty, Individually and On Behalf of All | Case No. 3:05cv7417 |

Others Similarly Situated,

    Plaintiff(s)

  v.

Dana Corporation, *et al.*,

    Defendants.

---

Alvin Greenberg, Individually and On Behalf of All Others Similarly Situated,

    Plaintiff(s)

  v.

Dana Corporation, *et al.*,

    Defendants.

Case No. 3:05cv7457

This is a securities case. Multiple plaintiffs have brought suit against Dana Corporation and some of its corporate officers alleging the company misstated its earnings, artificially inflating the value of its stock, in violation of the Securities Exchange Act of 1934. 15 U.S.C. §§ 78j(b), 78t(a). Jurisdiction exists under 28 U.S.C. § 1331.

Pending are competing motions to be named lead plaintiff. For the following reasons, the City of Philadelphia shall be named lead plaintiff.[1]

**Procedural Background**

Defendant Dana Corporation is a Toledo-based supplier of automobile parts. Plaintiffs are

---

[1] On March 3, 2006, Dana Corporation filed for Chapter 11 bankruptcy protection. Consequently, proceedings against Dana will likely have to be stayed. Plaintiffs, however, have alleged Dana and its officers are joint and severally liable for these violations. Thus, Dana's bankruptcy should not alter the "largest financial interest" analysis, as it appears that the case can proceed against the corporate officers.

all purchasers of Dana Corporation securities between March 23, 2005, and September 14, 2005. Some time before March 23, plaintiffs allege Dana, whose business had suffered due to price increases in raw materials, began to misstate its net income to meet earnings expectations. Plaintiffs claim they purchased Dana securities in reliance on these inaccurate financial records and suffered damage accordingly.

The plaintiffs each raise substantially similar claims and their cases were consolidated January 18, 2006. Three of them, the Mississippi Public Employees' Retirement System ("MPERS"), the Pensions Trust Fund Group ("PTFG"), and the City of Philadelphia Board of Pensions & Retirement ("City of Philadelphia"), seek to be appointed lead plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). 15 U.S.C. § 78u-4.

## Discussion

Congress enacted the PSLRA in response to a concern that securities litigation had become "lawyer-driven." H.R. Conf. Rep. No. 104-369, at 31-35 (1995). To combat abuses preceived to result from that situation, Congress sought to "encourage the most capable representatives of the plaintiff class to participate in class action litigation and to exercise supervision and control of the lawyers for the class. *Id.* at 32.

Consequently, when appointing a lead plaintiff, the PSLRA creates a rebuttable presumption in favor of the party with the largest financial interest. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). A competing plaintiff may refute that finding only by demonstrating that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class ... or is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa)-(bb).

### A. Largest Financial Interest

The PSLRA does not define how courts are to determine which plaintiff has the largest financial interest. *In re The Goodyear Tire & Rubber Comp. Sec. Litig.*, 2004 WL 3314943, *3 (N.D.Ohio 2004); *In re Cardinal Health, Inc. Sec. Litig.*, 26 F.R.D. 298, 302 (S.D.Ohio 2005); *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 100 (S.D.N.Y. 2005). Instead, courts have adopted two competing methodolgies: "first in, first out" (FIFO) and "last in, first out" (LIFO). *Compare In re Veeco Instruments, Inc.*, 2005 WL 3288652, *2 (S.D.N.Y. 2005) (applying FIFO) (citing Thompson v. *Shaw Group, Inc.*, 2004 WL 2988503 (E.D.La. 2004); *In re Cardinal*, 26 F.R.D. 298)[2]; *with In re Goodyear*, 2004 WL 3314943, *3 (applying LIFO and four-factor inquiry); *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295, (E.D.N.Y. 1998) (same); *In re Nice Sec. Litig.*, 188 F.R.D. 206, 217 (D.N.J. 1999) (same); *In re Cable & Wireless, PLC, Sec. Litig.*, 217 F.R.D. 372, 375 n.4 (E.D. Va. 2003) (same).

Here, the parties dispute the soundness of LIFO v. FIFO. Each party endorses a methodology that enhances its respective claim to lead plaintiff status.

## 1. FIFO v. LIFO

The largest financial interest inquiry is not complicated when parties only purchase and sell shares within the class period. The analysis, however, becomes more complicated when parties enter the class period having previously bought the defendant's securities. Then, the question arises: how to calculate plaintiff's damages from purchasing shares at allegedly inflated prices when it has,

---

[2] Upon closer examination, *In re Veeco* is less than compelling. Both cases that opinion relies on in support of FIFO offer support for LIFO upon closer examination. *see Thompson*, 2004 WL 2988503, *5 (noting competing methodologies suggested same result and stating that at later stages "FIFO may be insufficiently accurate and jettisoned in favor of LIFO"); *In re Cardinal*, 226 F.R.D. at 304 ("Lead Plaintiff candidates did not provide the Court with a breakdown of losses under LIFO ... designated Lead Plaintiff is the same under either methodology ... the Court 'resorts' to the FIFO methodology for the 'immediate narrow purpose' of evaluating the plaintiffs ... this use of FIFO in no way demonstrates a modicum of approval of FIFO.").

arguably, also profited from selling shares at the same inflated prices?

Under FIFO, a plaintiff's sales of defendant's shares during the class period are matched first against any pre-existing holdings of shares. The net gains or losses from those transactions are excluded from damage calculations.

In contrast, under LIFO a plaintiff's sales of defendant's share during the class period are matched first against the plaintiff's most recent purchase of defendant's shares and gains or losses from those transactions are considered in damage calculations.

Consequently, under FIFO, many plaintiffs will show damages from defendant's alleged misconduct when those plaintiffs actually profited from the misconduct. An example is instructive:

> Consider an Investor A with accumulated holdings of 10,000 shares of XYZ Corporation that were acquired when everything was on the up and up in terms of corporate disclosures, and that represent the investor's long-term commitment to the company's prospects. Assume further that unknown to Investor A but during what later turns out to be a plaintiffs' class period-a time when the nondisclosure of adverse information caused the stock price to be too high in terms of real value-Investor A both buys and sells an aggregate of 5,000 shares of XYZ stock in various transactions before the stock price later falls out of bed, and that such class-period transactions leave Investor A neither out of pocket nor in pocket when the expenditures for and the proceeds of those transactions are aggregated.
> Is there any real question that Investor A, who has thus retained the same long-term stake in XYZ that preceded the class period, has sustained neither gain nor loss from the transactions during the class period? To sharpen the issue even further, is there any question that Investor A is in an economic position identical to that of Investor B, someone who also held 10,000 shares of XYZ before the beginning of what later proved to be the class period, and who didn't trade at all during the class period? Or is there any question that both Investor A and Investor B are in the identical economic position as Investor C, a person who held no XYZ shares before the class period and whose purchases and sales during the class period, each aggregating 5,000 shares, also resulted in a wash in terms of the dollars involved?

*In re Comdisco Sec. Litig.*, 2004 WL 905938, *2-3 (N.D.Ill. 2004).

In the above scenario, using LIFO all three plaintiffs would have suffered the same damage: $0. But, under FIFO, while Investors B and C would show no damages, Investor A would show damages stemming from his purchase of the last 5,000 shares. Thus, City of Philadelphia argues

FIFO is not accurate and this court should adopt the LIFO methodology.

Plaintiffs MPERS and PTFG contend Judge Shadur's reasoning in *In re Comdisco, supra,* is unsound. They argue that any proceeds from sales correspond first to pre-existing holdings - ala FIFO - before being applied as a setoff against losses for the damage calculation. MPERS and PTFG offer in support of their contentions two arguments: 1) FIFO is the standard accounting method, used by the Internal Revenue Service (IRS); and 2) because courts do not award damages with respect to shares held prior to the class period, courts should likewise ignore profits with respect to those same shares. Neither argument is compelling.

First, the IRS and a court adjudicating securities litigation face very different issues in selecting accounting methodologies. While a court must calculate the harm a defendant has caused, the IRS adopts FIFO to deal with the peculiar incentives of the Internal Revenue Code. As Judge Shadur noted:

> [T]he reasons for [FIFO] treatment for income tax purposes are readily apparent: In light of the long-term trend of increasing values in stocks, plus the facts (1) that FIFO rather than LIFO therefore typically increases the measurement of currently recordable gains and (2) that stocks held until death get a stepped up basis while at the same time escaping income taxation entirely, what other approach might be expected from taxing authorities who are properly interested in maximizing the benefits to the fisc?

*Id.* at 2.

The IRS, therefore, adopts FIFO not because it is necessarily more accurate than LIFO, but because it forces taxpayers to recognize gains they would prefer - for tax purposes - to ignore.

In this context, however, FIFO has the opposite effect - allowing plaintiffs to cordon off their profits from the defendant's misconduct. Using FIFO, plaintiffs with significant pre-existing holdings of defendants' securities can profit from substantially from defendant's misconduct and then turn around and show a loss for purposes of litigation.

Second, MPERS's and PTFG's contention that because courts do not award damages for losses with respect to pre-existing shares, courts should likewise not subtract profits from the sale of those shares when calculating damages. That argument is unconvincing.

Securities laws punish firms who make material misstatements that induce investors to purchase their securities. With respect to any pre-existing shares, defendant's misconduct did not influence the purchases which were based on accurate information. Thus, those shares fall outside the purpose and plain language of the statute.

Further, losses with respect to pre-existing shares stem not from defendant's misconduct, but from the failure of defendant's business. If a firm overstates its earnings, artificially propping up its share price, and then corrects the problem causing that share price to fall, the drop in value itself is not a product of the overstatement - only the timing of the drop in value is. Put simply, the value of those pre-existing shares would have fallen even if the firm did not misstate its earnings - the drop in value would just have occurred sooner. Consequently, MPER's and PTFG's analogy is not well taken.

Therefore, to determine which party has the largest financial interest for the purposes of appointing a lead plaintiff, this court endorses the use of LIFO over FIFO. Consequently, the City of Philadelphia has the largest financial interest and is the presumptive lead plaintiff.

### 2. The Presumption in Favor of the City of Philadelphia Stands.

To rebut the presumption that lies in favor of the City of Philadelphia, MPERS and PTFG contend: 1) the City of Philadelphia already is engaged in four other securities matters and cannot, therefore, adequately represent the putative class; and 2) the City of Philadelphia's use of LIFO over FIFO, reducing its own damages by approximately $400,000, demonstrates it can not adequately represent the class. Neither argument has merit.

Unless a court grants an exception, "a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant other Federal Rules of Civil Procedure during any 3-year period." 15 U.S.C. § 78u-4(b)(3)(B)(vi). MPERS and PTFG acknowledge that the City of Philadelphia is not in violation of this provision, but argue that even where a plaintiff is not in literal violation of that rule, courts have the discretion to disqualify them from lead plaintiff contention if they are spread too thin. *see In re: OfficeMax, Inc. Sec. Litig.*, No. 1:00cv2432, Doc. 45, p. 15 ("Thus, the fact that one serves as a lead plaintiff in other class actions, even if fewer than five, though not determinative, is still relevant to the question of adequacy."). Having reviewed the submissions, there is nothing unique about the City of Philadelphia's involvement in other litigation that warrants an exercise of this discretion.

Second, MPERS and PTFG argue that the City of Philadelphia's advocacy of the LIFO methodology is in itself evidence that the City is unfit to serve as lead plaintiff. Any plaintiff that would voluntarily use an accounting method that reduces its own damages, they argue, cannot adequately represent the class.

That argument proves too much. It would incentivize the sacrifice of accounting accuracy to inflated damage calculations in all circumstances. Potential lead plaintiffs would use the most aggressive accounting methods possible, no matter how inaccurate and how likely the court would later reject such methods. The City of Philadelphia has reduced its damage calculation, but only by an amount it almost certainly could not recover at trial. That is being realistic, not poor advocacy.

Consequently, MPERS and PTFG have failed to rebut the presumption that lies in favor of the City of Philadelphia. The City's motion to be named lead plaintiff, therefore, shall be granted.

**Conclusion**

In light of the foregoing, it is, therefore,

ORDERED THAT:

1) the City of Philadelphia's motion to be appointed lead plaintiff be, and the same hereby is granted;

2) the City of Philadelphia's selection of Barrack, Rodos & Bacine as lead counsel be, and the same hereby is approved;

3) all other motions to be appointed lead plaintiff be, and the same hereby are denied.

So ordered.

<pre>
                                        s/James G. Carr
                                        James G. Carr
                                        Chief Judge
</pre>